IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NUANCE COMMUNICATIONS INC.,            )
and PHONETIC SYSTEMS LTD.,             )
                                       )
            Plaintiffs,                )
                                       )
    v.                                 )      C.A. No. 06-105-SLR
                                       )
TELLME NETWORKS, INC.,                 )      **REDACTED VERSION**
                                       )
            Defendant.                 )

**DECLARATION OF LISA C. BERRY
IN SUPPORT OF DEFENDANT TELLME NETWORKS, INC.'S
<u>MOTION TO STAY ACTION PENDING ARBITRATION</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
Wilmington, DE  19899
(302) 658-9200
  Attorneys for Defendant Tellme Networks, Inc.

Original Filing Date:  March 31, 2006

Redacted Filing Date:  April 7, 2006

## DECLARATION OF LISA C. BERRY

I, Lisa C. Berry, declare as follows:

1.    I am presently employed by defendant Tellme Networks, Inc. ("Tellme") as Vice President, General Counsel and Secretary. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I make this declaration in support of Tellme's "Motion to Stay Action Pending Arbitration."

2.    Attached hereto as Exhibit A is a true and correct copy of a November 1999 "Strategic Partner License and Support Agreement" (hereinafter, the "Agreement") between Tellme and "Nuance Communications."

3.    Attached hereto as Exhibit B is a true and correct copy of a September 30, 2003 "Letter Agreement for Tellme Networks, Inc." between Tellme and "Nuance Communications." The September 30, 2003 Letter Agreement states that the term of the 1999 Agreement "is hereby extended to expire on September 30, 2007 unless earlier terminated by its terms or by mutual agreement of the parties."

4.    Attached hereto as Exhibit C are true and correct copies of portions of the Delaware Secretary of State's file of corporate records pertaining to "Nuance Communications USA, Inc." (hereinafter, "Nuance USA"), including (a) a certification page from the Delaware Secretary of State dated March 17, 2006, certifying that the attached records are true and correct copies from the Secretary of State's file, (b) an "Agreement and Plan of Merger of Nuance Communications, Inc., a Delaware Corporation, and Nuance Communications, a California Corporation" dated March 10, 2000; and (c) a "Certificate of Amendment to the Amended and Restated Certificate of Incorporation of Nuance Communications, Inc." dated October 13, 2005.

5.    Attached hereto as Exhibit D are true and correct copies of portions of a Schedule 14A Proxy Statement filed by Nuance Communications, Inc. with the United States Securities and Exchange Commission dated August 1, 2005 concerning a proposed merger between Nuance Communications, Inc. and ScanSoft, Inc. that I obtained from www.sec.gov.

6.     Attached hereto as Exhibit E are true and correct copies of portions of the Delaware Secretary of State's file of corporate records pertaining to "Nuance Communications, Inc." (hereinafter, "Nuance"), including (a) a certification page from the Delaware Secretary of State dated March 17, 2006, certifying that the attached records are true and correct copies from the Secretary of State's file, (b) a "Certificate of Ownership and Merger Merging Nuance Communications, Inc. into Scansoft, Inc." dated October 17, 2005.

7.     Attached hereto as Exhibit F is a true and correct copy of a letter that Tellme received on February 17, 2006 from the Vice President and General Counsel of plaintiff Nuance written "on behalf of" Nuance USA. The February 17, 2006 purports to give notice of termination of the Agreement based upon an alleged disclosure of Nuance's confidential information by Tellme.

8.     Attached hereto as Exhibit G is a true and correct copy of a letter that I sent to Nuance and Nuance USA on February 21, 2006 in response to Nuance's letter dated February 17, 2006.

9.     Attached hereto as Exhibit H is a true and correct copy of an arbitration demand and attached cover letter that Tellme received on or about March 3, 2006 from the Vice President and General Counsel of plaintiff Nuance, again writing "on behalf of" Nuance USA.

10.     Attached hereto as Exhibit I is a true and correct copy of a letter that I sent to Nuance and Nuance USA on March 17, 2006 further responding to Nuance's letter dated February 17, 2006.

11.     Attached hereto as Exhibit J is a true and correct copy of a letter that Tellme received on or about March 22, 2006 from the Vice President and General Counsel of plaintiff Nuance, again written "on behalf of" Nuance USA, responding to Tellme's request that Nuance USA defend and indemnify Tellme pursuant to the express terms of the Agreement.

12.     Attached hereto as Exhibit K is a true and correct copy of Tellme's Answer and Counterclaim to Nuance USA's demand for arbitration. Tellme's Answer and Counterclaim was filed with the American Arbitration Association in California on March 24, 2006.

Executed on March 30, 2006, at Mountain View, California. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Lisa C. Berry

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 7, 2006 he electronically filed the

Declaration of Lisa C. Berry in Support of Defendant Tellme Networks, Inc.'s Motion to Stay

Action Pending Arbitration (Redacted Version) with the Clerk of the Court using CM/ECF,

which will send notification of such filing(s) to the following:

> Frederick L. Cottrell
> Richards, Layton & Finger

I also certify that copies were caused to be served on April 7, 2006 upon the

following in the manner indicated:

### BY HAND

> Frederick L. Cottrell
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE  19899

### BY FEDERAL EXPRESS

> Mark A. Samuels
> O'Melveny & Meyers LLP
> 400 South Hope Street
> Los Angeles, CA  90071

> */s/ Rodger D. Smith II*
> Rodger D. Smith II (#3778)
> rsmith@mnat.com

# EXHIBIT A

*1073-9507-CAT-19-Nov-99*

CONFIDENTIAL

## STRATEGIC PARTNER LICENSE AND SUPPORT AGREEMENT

This agreement ("Agreement") is between Nuance Communications, a California corporation with its principal place of business at 1380 Willow Road, Menlo Park, CA 94025 ("Nuance") and Tellme Networks, Inc., a Delaware corporation with its principal place of business at 977 Commercial Street, Palo Alto, CA 94301 ("Customer"). The terms of this Agreement shall apply to each Software license granted and to all services provided by Nuance under this Agreement. When completed and executed by both parties, this Agreement shall evidence the Software licenses granted and the services that are to be provided. The specific number of ports licensed will be evidenced by Customer signing an Order Form(s) (in the form attached as Schedule D).

### I. Definitions

1.1     "Commencement Date" shall mean the date, following any mutually agreed trial or pilot periods on which the Software, including without limitation new products, is received by Customer, or, if no delivery is necessary, the Effective Date of the relevant Order Form.

1.2     "Documentation" shall mean user documentation for use of and provided with the Software sufficient to explain the Software's operation, including without limitation any a.p.i. specifications or flowcharts for the licensed Software.

1.3     "Grammar" is a grammar for use with the Nuance voice recognition engine Software, that defines the allowable speech input.

1.4     "Grammar Maintenance" shall mean updates to any applicable Grammar which are periodically shipped to subscribing customers.

1.5     "Integrated System(s)" shall mean any of Customer's computer/operating system/IVR combination(s) that include and operate Nuance Software.

1.6     "Location(s)" shall mean Customer's multiple location(s), directly owned or leased or outsourced to a third party, wherever located in the world.

1.7     "Order Form" shall mean the document by which Customer orders the number of additional ports of Software licensed, a form of which is attached hereto as Schedule D. Order forms are not intended or allowed to include any legal terms in conflict with this Agreement. In the event of any conflict, the terms of this Agreement will prevail.

1.8     "Software" shall mean the unencrypted software programs in object code form described in Schedule A, the unencrypted Grammars in source code described in Schedule B, unencrypted Updates thereto (in applicable form), and associated Documentation.

1.9     "Supported Software License(s)" shall mean any Software licenses for which Customer has purchased Technical Support for the relevant time period.

1.10     "Technical Support" shall mean Software support as provided in the policy attached hereto as Schedule C.

1.11     "Update(s)" shall mean any bug fixes, patches, modifications, upgrades, improvements, and enhancements to the Software as may be generally made available for Supported Software Licenses at no additional charge, other than media and handling charges. Updates shall not include any releases, options or future products which Nuance licenses separately for an additional fee.

1

CONFIDENTIAL

**II.    Software License**

**2.1    Rights Granted**

A.    Nuance grants to Customer and Customer accepts a worldwide, perpetual, fully paid-up, irrevocable (so long as Customer is in compliance with the terms of this Agreement), non-exclusive, non-transferable (except for assignment in accordance with Section 2.3) license under all of Nuance's intellectual property rights as follows:

    i.    to use, execute, demonstrate, implement, integrate into other software programs, support, maintain, perform services with the Software in object code listed in Schedules A and B, and any Updates thereof, solely for Customer's business and enhancements thereto; solely on an Integrated System or on a backup or testing system; solely at Location(s); and solely for the capacity number of ports or other limitation (if any limitation applies) ordered pursuant to an executed Order Form;

    ii.    to use, implement, integrate into other software programs, and create derivative works of the Grammars in source code listed in Schedule B, and any Updates thereof, solely for Customer's business and enhancements thereto, solely at the Location(s), and solely for the purpose of improving, developing, or enhancing an Integrated System and/or Customer's service (to the extent such service is based on Nuance's software as opposed to a competitor's). Customer agrees not to disclose, publish or disseminate any Nuance source code to any entity or person other than those of its employees or independent contractors with a demonstrated need to know such information and who agree to be bound by confidentiality restrictions substantially similar to those contained herein. Customer agrees to take all reasonable precautions to prevent any unauthorized use, disclosure, publication or dissemination of the Nuance source code, but at a minimum, Customer will take at least those measures that Customer takes to protect its own confidential and proprietary source code or other materials of a highly sensitive and valuable nature. Customer acknowledges and agrees that all source code is provided strictly "as is" and without any warranty of any kind, either express or implied, and that any warranties provided in Section VI shall not apply in any way to the source code, including without limitation any modifications thereto, any derivative works thereof, or any of Customer's other uses of the source code. Customer also acknowledges and agrees that Nuance's indemnity obligation in Section 7.1 shall not apply in any way to the source code, including without limitation any modification of the source code, any derivative work thereof, or any of Customer's uses of the source code. Customer acknowledges and agrees that Updates shall be provided for the Nuance source code only, and not to any of Customer's modifications or derivative works of the Nuance source code. Customer acknowledges and agrees that Nuance has no obligation under any Technical Support Services that may be provided under this Agreement or otherwise to provide technical support or assistance to or with regard to any Nuance source code, any modifications of the source code, or any derivative works thereof.

    iii.    to copy and use the Documentation provided with the Software in support of Customer's authorized use of the Software;

    iv.    to make a reasonable number of copies of the Documentation in connection with Customer's use, and of the Software for archival or backup purposes; no other copies shall be made

CONFIDENTIAL

without Nuance's prior written consent. Customer may use the Software on a reasonable number of backup Integrated Systems to provide for cases in which the production Integrated Systems for which they were acquired are rendered inoperable. Under no circumstances shall Customer use the Software on a production Integrated System and the backup Integrated System at any given Location simultaneously except for backup purposes. Customer agrees not to alter, change, or remove from the Software any identifications, including copyright and trademark notices, and further agrees to place such markings on any copies of the Software. All archival and backup copies of the Software are subject to the terms of this Agreement;

v.  to receive the Software via electronic distribution (or, at Customer's request upon reasonable notice to Nuance, CD or other media Customer designates), which medium will not change without prior written consent of the parties;

vi.  In the event Customer receives access to any Nuance source code or other proprietary rights under the terms of any escrow agreement, Customer acknowledges and agrees that all such materials are subject to the license provisions hereof and may be used solely to the extent necessary to further the terms of this Agreement.

Customer shall not copy or use the Software (including the Documentation) except as otherwise specified in this Agreement. Customer agrees it will not sublicense, transfer, pledge, lease, rent, or share its rights under this Agreement, provided that nothing herein shall limit Customer's ability to carry on its business using co-branding, marketing, distribution, operational outsourcing, and other arrangements with third parties.

B.  Nuance shall retain all right, title and interest in the Software, including patent, copyright, trade secret, and trademark rights. Except as otherwise expressly stated in this Agreement, Customer does not acquire any rights, express or implied, in the Software.

C.  Except as may be allowed by applicable law, Customer shall not cause or permit the reverse engineering, decompilation, disassembly or other translation of the Software.

D.  Customer reserves the right to independently develop, market, distribute, and otherwise commercially exploit documentation, software and/or firmware products of any type whatsoever, including without limitation software and/or firmware that are similar to, have the same function as, or compete with, the Software, so long as Customer does not use the Confidential Information of Nuance.

E.  Customer may transfer the license to another Integrated System within its organization.

F.  Customer shall have the right to allow its third party agents, suppliers, and customers to use the Software for Customer's business purposes, provided Customer ensures such use is in accordance with the terms of this Agreement.

G.  For a period of four (4) years, Nuance agrees to adhere to the schedule of prices for Software attached hereto and not to increase prices for items of Software above that indicated.

H.  Nuance shall offer Customer in the future all Software, modifications, enhancements, new products, and programming-related services no later than the time it makes these available to any other customer or third party, including in alpha, beta, or other early or trial form. Customer will also be, at no extra charge, a beta test site for all Nuance's pre-release versions and features, provided that Customer is willing to and does adhere to the reporting and associated obligations that Nuance routinely imposes on other beta test sites in connection with such status. Nuance shall offer its future software products, including without limitation additional languages and Grammars, to Customer at the same discount schedule set forth in Exhibit B, and determined under that schedule by the quantity of recognition ports that have been already paid for at the

3

CONFIDENTIAL

time of any applicable order.

I.  Nuance agrees in particular to use commercially reasonable efforts to develop and improve its voice recognition software, including the accuracy rates thereof in both landline and cellular calls.

J.  The parties agree to negotiate in good faith, and execute, a source code escrow agreement.

**2.2 Acceptance.** Customer shall be deemed to have accepted the Software on the Commencement Date. If Customer is granted a right to copy the Software, all copies shall be deemed accepted upon acceptance of the master copy.

**2.3 Assignment.** Neither party will assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party except in the instances (i) to an "Affiliate" (i.e., controlled by, controlling, or under common control with the assigning party), (ii) of a merger, sale or transfer of substantially all a party's assets, and (iii) of a successor entity related to the assigning party by consolidation, nonbankruptcy, reorganization, tax restructuring, or government action.

**2.4 Audit.**

Nuance may, at Nuance's expense, not more than once annually, and upon reasonable advance notice to Customer and agreement on reasonable date and time, which date shall be within thirty days of Customer's receipt of notice, audit Customer's use of the Software. Any such audit shall be conducted during business hours, shall not unreasonably interfere with Customer's business activities, and shall be limited to such records necessary to determine whether appropriate license fees have been paid and to determine whether Customer is otherwise in compliance with this Agreement. If such an audit reveals that Customer has underpaid fees to Nuance, Customer shall be invoiced for the underpaid fees at the agreed prices.

**III. Technical Support Services**

Technical Support services and Grammar Maintenance services ordered by Customer will be provided under Nuance's Technical Support and Grammar Maintenance policies attached as Schedule C hereto. Such services shall be charged for at the fees agreed by the parties. For any on-site services requested by Customer, Customer shall reimburse Nuance for those actual, reasonable travel and out-of-pocket expenses which are approved in writing by Customer prior to being incurred.

**REDACTED**

**IV. Professional Services**

Nuance and Customer, from time to time, may agree upon additional development and other services to be provided by Nuance (collectively, "Professional Services"), including:

(i)   Performing transcriptions, developing acoustical models, and generally "tuning" and improving accuracy of the Software pursuant to an associated Statement of Work (a form of which is attached hereto as Exhibit A) ("SOW").

(ii)  Other development, grammar, dialog, or Software design or service assistance agreed upon by the parties.

4

CONFIDENTIAL

The exact Professional Services will be as described in the SOW. The fees for such Professional Services shall be as specified in the applicable SOW. Ownership of all documents, waveforms, and other deliverables and materials generated by Nuance pursuant to providing Professional Services shall be designated in the applicable SOW. Should Nuance be designated as the owner, Customer shall have a perpetual, non-exclusive, worldwide license to use such documents, deliverables, and other materials solely in conjunction with the Software or other Nuance technology. Should Customer be designated as the owner, Customer shall have all right title and interest in the deliverables; provided, however, Nuance shall retain all right, title, and interest in all intellectual property that was pre-existing and incorporated into the deliverables (the "Preexisting IP"), as to which Nuance hereby grants Customer a non-exclusive, worldwide license to use the Preexisting IP solely in connection with the deliverables.   Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be deemed to assign rights to or limit Nuance's use of any know-how or knowledge that is not the Confidential Information of Customer and that Nuance had prior to entering this Agreement or that Nuance obtains during its performance under this Agreement, except that Customer must continue to own, and Nuance must not license, provide to, or use for the benefit of others, rights or know-how that are proprietary to Customer's business.

In the event Customer requests Nuance to tune any Integrated System (specifically excluding the training of any acoustic models), Customer shall supply to Nuance the following information: (1) an adequate description of the system and dialogue; (2) the grammars involved; (3) a list of the parameter settings for the system; (4) a description of the specific issues Customer wants addressed; and, (5) examples of problematic utterances, if available. Upon receipt of all of the foregoing information, Nuance shall provide Customer, within five (5) business days, a written proposal that includes: (1) the proposed start date; (2) the expected amount of effort (which may be billed on a time and materials basis); and, (3) expected milestones or completion dates. Nothing herein shall prevent the parties from agreeing upon an SOW that contemplates continuance services over a period a time.

The parties agree to discuss any of Customer's suggested improvements to the Nuance acoustic models, and to negotiate in good faith any applicable SOWs that may be contemplated in connection therewith.

V.      Term and Termination

5.1 Term. This Agreement shall remain in effect for five (5) years and shall be automatically renewable each succeeding year thereafter unless (i) written notice to the contrary is sent thirty (30) days prior to each one-year anniversary after the Commencement Date of this Agreement, or (ii) unless otherwise terminated as set forth below.

5.2 Termination by Customer. Customer may terminate this Agreement or any Software license at any time upon written notice to Nuance.

5.3 Termination for Cause. Either Party may terminate this Agreement or any Software license or service upon written notice if the other breaches this Agreement and fails to correct such breach within thirty (30) days of written notice specifying the breach.

5.4 Effect of Termination. Termination of this Agreement or any Software license by either party shall not limit either party from pursuing any other remedies available to it, including injunctive relief, nor shall such termination release Customer from any obligation to pay all fees that have accrued or that Customer has agreed to pay under any Order Form under this Agreement up to the date of termination. The parties' rights and obligations under Sections 2.1.A, 2.1.B, 2.1.C, 2.1.D., 2.3, and Articles V, VI, VII, VIII, and IX shall survive termination of this Agreement.

If this Agreement expires at the end of its term or is terminated by Customer with or without cause, then (a) Customer shall continue to have the licenses granted on a fully paid-up and perpetual basis including the right to continue using the copies of the Software then in its possession to continue its service, and (b) the terms of this Agreement that need to survive in order to enable this Agreement so survive for this purpose. If a license granted

5

CONFIDENTIAL

under this Agreement terminates for reasons of Customer's material breach, then Customer will (a) cease using the applicable Software, and (b) certify to Nuance within thirty (30) days of expiration or termination that Customer has destroyed or returned to Nuance the Software and all copies thereof remaining in Customer's possession. This requirement applies to copies in all forms, partial and complete, in all types of media and computer memory, and whether or not modified or merged into other materials.

## VI. Warranties and Limitation of Liability

### 6.1 Warranties and Disclaimers

A. **Software License.** Nuance warrants that for a period of six (6) months from the Commencement Date (or if prior to Customer's initial launch of its product/service, from six (6) months from the date of such launch), each unmodified copy of the Software will perform the functions described in the Documentation. Nuance does not warrant that the Software will meet Customer's requirements, that the Software will operate in the combinations which Customer may select for use, that the operation of the Software will be uninterrupted or error-free, or that all Software errors will be corrected. Upon written notification within the warranty period of a verifiable non-conformance with the Documentation, the warranty period shall begin anew upon re-release of the corrected Software.

B. **Media.** Nuance warrants the tapes, diskettes, or other media to be free of defects in materials and workmanship under normal use for ninety (90) days from the Commencement Date.

C. **Professional Services.** Nuance warrants that its Technical Support services will be performed in a good and professional manner and consistent with generally accepted industry standards. This warranty shall be valid for six (6) months from performance of service.

D. Nuance warrants that (i) it owns or has license rights to sublicense the Software and has all necessary intellectual property and other rights, title, and interest to grant the rights set forth herein to Customer, free of any claims, liens, or conflicting rights in favor of any third party, (ii) no agreements with third parties preclude Customer from using the Software in any way, and that (iii) no claims or litigation are pending against Nuance with respect to the Software or related intellectual property rights;

E. Nuance warrants that the Software does not knowingly infringe any intellectual property right of any third party;

F. Nuance warrants that the Software is free from any viruses at the time of delivery to Customer, and has no other program or feature, including without limit "back doors," and, except for test-load licenses mutually agreed with and notified in advance to Customer, "time bombs," "drop dead" or other instructions that impede the functionality of the Software or erase, disable, or harm Customer's data, other software, or hardware, after a period of time, upon transfer to another processor, or otherwise, and if Nuance discovers any such feature it will immediately notify Customer and take steps at its own expense to remove the feature and remedy the implications;

G. Nuance warrants that, so long as the hardware, software or systems not provided by Nuance exchange accurate date data with the Software, the Software (i) will accurately process Date Data, and (ii) will function without error or interruption related to Date Data from more than one century.. "Date Data" means any data or input (other than from an individual user responding to a dialogue prompt) that includes an indication of or reference to date.

1. **Limitations.** Except as expressly set forth in section 6.1 ("Warranties and Disclaimers") above, the Software is provided strictly "as is," and Nuance makes no additional warranties, express, implied, arising from course of dealing or usage of trade, or statutory, as to the Software or any

6

CONFIDENTIAL

matter whatsoever. In particular, any and all warranties of merchantability, fitness for a particular purpose and (except for the above infringement warranty in 6.1E above and subject to Nuance's indemnification obligations herein) non-infringement [okay]are expressly excluded. This is a limited warranty and is the only warranty made by Nuance. If pre-production (or "alpha" or "beta") releases of Software are provided to Customer, such copies are provided "as-is" without warranty of any kind.

6.2 Exclusive Remedies. For any breach of the warranties contained in Section 6.1 above, Customer's exclusive remedy, and Nuance's entire liability, shall be:

A.    For Software. The correction of Software errors that cause breach of the warranty, or if Nuance is unable to make the Software work as warranted, Customer shall be entitled to terminate the Software license and recover all fees paid therefor.

B.    For Media. The prompt replacement of defective media returned to Nuance within ninety (90) days of the Commencement Date.

C.    For Professional Services. The re-performance of Professional Services, or if Nuance is unable to perform the services as warranted, Customer shall be entitled to recover the fees paid therefor.

6.3 Limitation of Liability. In no event shall either party be liable to the other for any special, indirect, incidental, or consequential damages, or damages for loss of profits, savings, revenue, use, damaged files or data, or business interruption, incurred by either party or any third party, which may arise in connection with this Agreement or the use and support of the Software, regardless of whether such claims are based on remedies are sought in contract or tort, even if the other party has been advised of the possibility of such damages. In no event shall Nuance be liable for any damages based upon the recognition accuracy of the Nuance software or for the cost of procurement of substitute goods.

## VII.  Indemnity

7.1 Nuance Indemnity. Nuance will defend and indemnify Customer, its shareholders, directors, officers, employees, agents and affiliated companies from and against any losses, costs, or damages (including reasonable attorneys' fees) against a claim that Software furnished and used within the scope of this Agreement infringes any patent, copyright, or trademark or other intellectual property right, provided that: (a) Customer notifies Nuance of such claim in writing within sixty (60) days of the claim; (b) at Nuance's expense, Nuance has sole control of the defense and settlement negotiations to the extent based upon the Software; and (c) Customer provides Nuance with the reasonable assistance, information, and authority necessary to perform Nuance's obligations under this Article, Nuance's indemnification obligation in the event these conditions are not met will only be reduced to the extent that such failure has materially harmed Nuance's ability to successfully address the matter. Nuance shall have no liability for any claim of infringement to the extent such claim is based on: (i) use of a superseded or altered release of the Software where a current release has been made available to Customer at no extra charge and such altered release of the Software is in violation of the terms of this Agreement (if the infringement would have been avoided by the use of a current or unaltered release of the Software); (ii) use of the Software in combination with other hardware or software not provided by Nuance and not required to operate the Software in conformance to the Documentation; (iii) a Customer or third party application as opposed to the Nuance Software; (iv) Professional Services in compliance with Customer's design specifications; or (v) use of the Software other than as permitted under this Agreement or in a manner for which it was not intended.

In the event the Software is held or is reasonably believed by Nuance to infringe, Nuance shall have the option, at its expense and no expense to Customer, providing that there is no loss of functionality to Customer, to: (a) modify the Software to be non-infringing (provided that such modified Software is of equal or superior

7

CONFIDENTIAL

functional capability); (b) procure (at no cost to the Customer) a license for the Customer to continue using the Software in a manner equivalent to the license provided herein; (c) replace the Software with compatible computer software of equal or superior functional capability; or, if it is not commercially reasonable for Nuance to perform (a), (b) or (c), then, (d) terminate the license for the infringing Software and refund all fees paid for that Software, prorated over a straight-line three year method. This Article VI and Articles 6.1 D and E state Nuance's entire liability and Customer's exclusive remedy for infringement.

7.2 Customer Indemnity. Except with respect to Nuance's indemnity as described in this Section 7, Customer agrees to indemnify, defend and hold harmless Nuance, its shareholders, directors, officers, employees, agents and affiliated companies from and against any losses, costs, or damages (including reasonable attorneys' fees) resulting from any claims by third parties that Customer (a) has materially misrepresented Nuance- or the Software; or (b) that Customer's use of the Software infringes a third party intellectual property right that would not have been infringed by the Software alone and provided that such claim is not covered under Section 7.1. Indemnification pursuant to this Section 7.2 is conditioned upon: (a) Nuance notifying Customer of such claim in writing within thirty (30) days of the claim; (b) at Customer's expense, Nuance grants Customer sole control of the defense and settlement negotiations; and (c) Nuance provides Customer with the reasonable assistance, information, and authority necessary to perform Customer's obligations under this Article.

VIII.  Pricing and Payment of Fees

The prices for the Software and Technical Support are set forth in Exhibit B.

Customer may purchase Nuance's grammar products in source code form if such grammars are otherwise commercially available at a price based on a similar pricing methodology employed used to price the currently licensed grammars. The parties agree to discuss in good faith any of Customer's requests to receive/purchase in source code form Nuance's pitch-based endpointer and/or barge-in technology.

All fees hereunder shall be due and payable net thirty (30) days of the date of invoice in the lawful money of the United States of America. All Technical Support fees shall be payable quarterly in advance, net thirty (30) days from the date of invoice. Any amounts payable by Customer hereunder which remain unpaid after the due date shall be subject to late penalty fees equal to 1.5% per month from the due date until such amount is paid. Customer agrees to pay reasonable applicable media and shipping charges.

Fees hereunder do not include local, state, or federal sales, use, property, value-added, or other taxes based on the licenses and services provided under this Agreement or Customer's use thereof. Customer agrees to pay all such taxes as may be imposed upon Nuance or Customer. Customer shall be invoiced for such taxes if Nuance is required to pay them on Customer's behalf. This provision shall not apply to taxes based on Nuance's income.

IX.  Other

9.1 Confidential Information. By virtue of this Agreement, the parties may have access to information that is confidential to one another ("Confidential Information"). Confidential Information shall include all information of a party that is indicated to be (including orally), marked as, or should reasonably be deemed to be confidential.

A party's Confidential Information shall not include information that: (a) is or becomes a part of the public domain through no act or omission of the receiving party; (b) was in the receiving party's lawful possession prior to the disclosure and had not been obtained by the receiving party either directly or indirectly from the disclosing or another party with a duty of confidentiality; (c) is lawfully disclosed to the receiving party by a third party without restriction on disclosure; or (d) is independently developed by the receiving party. Customer shall not disclose the results of any benchmark tests of the Software to any third party without Nuance's prior

8

**CONFIDENTIAL**

written approval.

The parties agree to hold each other's Confidential Information in confidence during the term of this Agreement and for so long after the termination of this Agreement as the information remains Confidential Information. The parties agree that, unless required by law, they will not make each other's Confidential Information available in any form to any third party, including customers or customer prospects, or use each other's Confidential Information for any purpose other than the implementation of this Agreement. Each party agrees to take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by its employees or agents in violation of the terms of this Agreement. Except as provided herein, neither party shall have the right to use the other party's name in conjunction with any product or service offered.

9.2 **In-Service Data.** Subject to Customer's "Ability" to grant access and rights to the "In-Service Data", Nuance shall have access and rights to the In-Service Data generated through the use of each Integrated System in which Software is installed. For the purposes of this Section 9.2, "Ability" means that the Customer has the technical ability and that Customer believes that it can, without undue cost or administrative burden, provide the In-Service Data to Nuance without civil or criminal liability or otherwise in violation of its privacy policies or any agreements with its customers. For the purposes of this Section 9.2, "In-Service Data" means the input to an Integrated System by Customer's end users. Both parties acknowledge that the use of such In-Service Data shall be to improve the performance of the Software for the Customer and its end users, but that such In-Service Data may also be used to train, refine, supplement or test the Nuance speech recognition and natural language understanding software, models and algorithms, and that the resulting improvements to the software, models and algorithms may be used for the benefit of all users of Nuance software. Notwithstanding anything herein, Nuance shall have no rights to the content of any In-Service Data which includes any Confidential Information of Customer or its end users or that in Customer's discretion confers unique, proprietary, or competitive advantages to Customer's business.

9.3 **Export.** Customer agrees to comply fully with all relevant export laws and regulations of the United States ("Export Laws") to assure that the Software is not (a) exported, directly or indirectly, in violation of Export Laws; or (b) intended to be used for any purposes prohibited by the Export Laws, including, without limitation, nuclear, chemical, or biological weapons proliferation. Nuance represents that the Software is not currently controlled software or subject to validated license requirements under the Export Laws.

9.4 **Notice.** All notices under this Agreement, including notices of address change, shall be in writing and shall be deemed to have been given when sent by registered mail, return receipt requested, to the addresses listed above, or to such other address as one party has notified the other party.

9.5 **Dispute Resolution.** Any controversy or claim between the parties, whether sounding in contract, tort, or otherwise, arising out of or relating to the formation or performance of this Agreement shall first be submitted to the senior managers of each party responsible for the issue(s), and should they not be able to resolve the dispute within three (3) business days, shall then be submitted to the respective CEO's of the parties, who shall meet face-to-face to try to resolve the matter as soon as possible and in any event no later than ten (10) calendar days. Failing resolution by such a meeting(s), the controversy or claim shall be resolved by arbitration administered by the American Arbitration Association. The arbitration shall occur in San Francisco, California. Judgment on any award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. All disputes arising under this Agreement shall be conducted under confidential proceedings.

9.6 **Legal Expenses.** In the event legal action is taken by either party to enforce this Agreement, all costs and expenses, including reasonable attorney's fees incurred by the prevailing party, shall be paid by the other party.

9.7 **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be illegal,

9

**CONFIDENTIAL**

unenforceable, or in conflict with any law of a federal, state, or local government, the validity of the remaining portions or provisions shall remain in full force and effect.

9.8 **Governing Law.** This Agreement shall be construed and enforced according to the laws of the State of California, without respect to its conflict of law principles. The parties agree to the exclusive and personal jurisdiction of the courts located in the Northern District of California for all disputes arising from this Agreement.

9.9 **Relationship of the Parties.** The relationship of the parties is that of independent contractors. No one party is the agent of the other and neither party is authorized to act on behalf of the other party.

9.10 **Waiver.** The waiver by either party of any default or breach of this Agreement shall not constitute a waiver of any other or subsequent default or breach.

9.11 **U.S. Government Restricted Rights.** The Software is provided with restricted rights. Use, duplication, or disclosure by the U.S. Government is subject to restrictions as set forth in subparagraph (c)(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 or subparagraphs (c)(1) and (2) of the Commercial Computer Software - Restricted Rights at 48 CFR 52.227-19, as applicable. Contractor/manufacturer is Nuance Communications, 1380 Willow Road, Menlo Park, CA 94025.

9.12 **Publicity.** The terms of this Agreement will be kept confidential. The parties will consult with each other and obtain prior written consent prior to any press releases announcing the existence of this Agreement. Nuance must seek Customer's written consent prior to using Customer as a reference for its products.

9.13 **Entire Agreement.** This Agreement contains all the agreements, representations, and understandings of the parties hereto and supersedes any previous understandings, commitments, or agreements, oral or written, with respect to the subject matter of this Agreement. It is expressly agreed that all terms of any Customer purchase order, order acknowledgement, or acceptance or other ordering or acceptance document shall be superseded by the terms of this Agreement. This Agreement may not be modified or amended except in a writing signed by a duly authorized representative of each party; no other act, usage, or customer shall be deemed to amend or modify this Agreement.

**REDACTED**

**CONFIDENTIAL**

limitation any and all warranties of merchantability and fitness for a particular purpose.

Nuance shall have no obligation to maintain or support the Enhanced Acoustic Models, except as may be otherwise provided in any executed SOW. Customer acknowledges and agrees that Nuance is under no obligation to provide any Updates of or with respect to any Enhanced Acoustic Model.

9.15 **Tromboning.** Customer may require "tromboning" or conference calling applications for its service. Because the Software requires only a single instance of a Recognition Client (i.e., speech channel) in order to perform a single tromboned call, no additional port licenses are required to perform a tromboned call, such that Customer need not purchase additional per port Software licenses to support a tromboned call.

9.16 **Parties' Intention.**

A.     For the purposes of this Section 9.14, "Services" means the provision of information and content (such as stock quotes, weather reports, news, sports reports, horoscopes, traffic reports, soap opera updates, restaurant recommendations and driving directions) to the public via a software-based telephone interface.

B.     Customer represents that it intends, following the Effective Date, to offer Services. Nuance represents that, as of the Effective Date, Nuance does not intend to offer Services directly or through an Affiliate. The parties understand and agree that other Nuance licensees may offer services that directly compete with the services provided by Customer.

C.     If, following the Effective Date, Nuance determines that it will offer services that directly compete with the Services provided by Customer, then Nuance shall notify Customer thereof as soon as reasonably practicable following such determination. Following any such notification, Nuance and Customer shall discuss the situation, including whether Customer wishes to terminate this Agreement in accordance herewith. Nuance shall not act through an Affiliate for the purpose of avoiding its obligations under this Section 9.16.

D.     The services provided by Nuance to Customer pursuant to Sections 2.1H (provision of future Software), III (Technical Support Services) and IV (Professional Services) hereof shall be of the same quality, and shall be provided with the same timeliness and responsiveness, as like services provided by Nuance to its other customers generally. In the event of a breach of the foregoing, Customer may terminate this Agreement in accordance herewith.

9.17 **Headings.** The title and section headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or extent of this Agreement or such section, and in any way affect this Agreement.

11

CONFIDENTIAL

9.18  Counterparts.  This Agreement may be executed by facsimile in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument.

The Effective Date of this Agreement shall be November 19, 1999.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

| Nuance Communications | Teltime Networks, Inc. |
|---|---|
| Authorized Signature: | Authorized Signature: |
| Printed Name: David Crum | Printed Name: Joe W. Pitts III |
| Title: CEO | Title: Vice President |
| Date: 1/15/ 99 | Date: 11/19/99 |

12

12

CONFIDENTIAL

9.18  Counterparts.  This Agreement may be executed by facsimile in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument.

The Effective Date of this Agreement shall be November 19, 1999.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

| Nuance Communications | Tellme Networks, Inc. |
|---|---|
| Authorized Signature:_____ | Authorized Signature: _____ |
| Printed Name:_____ | Printed Name: _Joe W. Pitts III_ |
| Title:_____ | Title: _Vice President_ |
| Date:_____ | Date: _11/19/99_ |

12

13

CONFIDENTIAL

Exhibit A

REDACTED

14

**Exhibit B**

**REDACTED**

15

Exhibit B

REDACTED

ORDER FORM

REDACTED

17

REDACTED

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

| Nuance Communication | Customer Name: _Tellnc Networks Inc._ |
| Authorized Signature: | Authorized Signature: |
| Printed Name: _RONALD CROSBY_ | Printed Name: _Joe Willits III_ |
| Title: _CEO_ | Title: _Vice President_ |

18

REDACTED

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

| Nuance Communications | Customer Name _____ Tellne Networks Inc. |
|---|---|
| Authorized Signature: _____ | Authorized Signature: _____ |
| Printed Name: _____ | Printed Name: _____ Joe J. Pitts III |
| Title: _____ | Title: _____ Vice President |

19

CONFIDENTIAL

SCHEDULE A

REDACTED

CONFIDENTIAL

SCHEDULE B

REDACTED

21

SCHEDULE C

REDACTED

22

REDACTED

REDACTED

24

REDACTED

REDACTED

Accepted and Agreed to by:

| NUANCE COMMUNICATIONS | CUSTOMER/PARTNER |
|---|---|
| Signature: _Xgg_ | Signature: _Joel Bragg_ |
| Name: _Brian Thompson_ | Name: _Joe al $...$ ad'sta_ |
| Date: _11/19/99_ | Date: _11/19/99_ |

Page 2 of 2

26

EXHIBIT B

Sep 30 03 05:21p                                         650    77900          P.2



**NUANCE**

September 30, 2003

Nuance
1005 Hamilton Court
Menlo Park, CA 94025
Main   650.847.0000
Fax    650.847.7979
www.nuance.com

Ben H. Lyon
Tellme Networks
1310 Villa Street
Mountain View, CA  94041

Re:  Letter Agreement for Tellme Networks, Inc.

Dear Ben:

Pursuant to the discussions between our respective representatives, this letter agreement
confirms that Nuance shall provide Tellme Networks, Inc. (Tellme") with the below
volume-based pricing schedule for Automated Speech Recognition software ("ASR") as
set forth herein.  Such pricing schedule is valid for to Tellme through September 30, 2007
for orders placed under the Strategic Partner License and Support and Agreement
between the parties dated November 19, 1999 (the "Current Agreement") or any
superceding agreement between the parties.  In addition, the term of the Current
Agreement between the parties is hereby extended to expire on September 30, 2007
unless earlier terminated by its terms or by mutual agreement of the parties.

**Automated Speech Recognition Pricing Valid through September 30, 2007:**




**REDACTED**


Nuance looks forward to its ongoing business relationship with Tellme.  Please sign in
the space provided below to signify your agreement to the above terms and conditions.

Sincerely,                                    Agreed and Acknowledged:  9/30/03

Karen Blasing                                 Ben H. Lyon
Title: Chief Financial Officer                VP General Counsel
Nuance Communications                         Tellme Networks, Inc.


Nuance. Speech. Understanding. Action.

**EXHIBIT B**

27

# EXHIBIT C

# Delaware

PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "NUANCE COMMUNICATIONS USA, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE EIGHTEENTH DAY OF NOVEMBER, A.D. 1999, AT 6 O'CLOCK P.M.

CERTIFICATE OF AGREEMENT OF MERGER, FILED THE TWENTIETH DAY OF MARCH, A.D. 2000, AT 2 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE SEVENTEENTH DAY OF APRIL, A.D. 2000, AT 1 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE ELEVENTH DAY OF DECEMBER, A.D. 2002, AT 9 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE FIFTEENTH DAY OF SEPTEMBER, A.D. 2005, AT 6:35 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "NUANCE COMMUNICATIONS, INC." TO "NUANCE COMMUNICATIONS USA, INC.", FILED THE THIRTEENTH DAY OF OCTOBER, A.D. 2005, AT 7:01 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID

_Harriet Smith Windsor_
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 4599047

3128763    8100H

060258232

DATE: 03-17-06

**EXHIBIT C**

28



PAGE 2

## The First State

CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID CORPORATION, "NUANCE COMMUNICATIONS USA, INC.".

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3128763    8100H

060258232

AUTHENTICATION:  4599047

DATE:  03-17-06

29

# AGREEMENT AND PLAN OF MERGER OF
## NUANCE COMMUNICATIONS, INC., A DELAWARE CORPORATION,
## AND NUANCE COMMUNICATIONS, A CALIFORNIA CORPORATION

THIS AGREEMENT AND PLAN OF MERGER dated as of March 10, 2000 (the "Agreement") is between Nuance Communications, Inc., a Delaware corporation ("Nuance-Delaware"), and Nuance Communications, a California corporation ("Nuance-California"). Nuance-Delaware and Nuance-California are sometimes referred to herein as the "Constituent Corporations."

## RECITALS

A.    Nuance-Delaware is a corporation duly organized and existing under the laws of the State of Delaware and has an authorized capital of 89,954,152 shares, $0.001 par value of which 50,000,000 shares are designated "Common Stock" and 39,954,152 shares are designated "Preferred Stock." Of the authorized shares of Preferred Stock, 3,150,000 shares are designated Series A Preferred Stock, 5,000,000 shares are designated Series B Preferred Stock, 3,575,000 shares are designated Series C Preferred Stock, 3,752,076 shares are designated Series D Preferred Stock, 4,500,000 shares are designated Series E Preferred Stock, 3,150,000 shares are designated Series A-1 Preferred Stock, 5,000,000 shares are designated Series B-1 Preferred Stock, 3,575,000 shares are designated Series C-1 Preferred Stock, 3,752,076 shares are designated Series D-1 Preferred Stock, and 4,500,000 shares are designated Series E-1 Preferred Stock. As of the date hereof, 100 shares of Common Stock of Nuance-Delaware were issued and outstanding, all of which are held by Nuance-California. There were no shares of Preferred Stock outstanding.

B.    Nuance-California is a corporation duly organized and existing under the laws of the State of California and has an authorized capital of 89,954,152 shares, no par value, of which 50,000,000 shares are designated "Common Stock," no par value, and 39,954,152 shares are designated "Preferred Stock," no par value. Of the authorized shares of Preferred Stock, 3,150,000 shares are designated Series A Preferred Stock, 5,000,000 shares are designated Series B Preferred Stock, 3,575,000 shares are designated Series C Preferred Stock, 3,752,076 shares are designated Series D Preferred Stock, 4,500,000 shares are designated Series E Preferred Stock, 3,150,000 shares are designated Series A-1 Preferred Stock, 5,000,000 shares are designated Series B-1 Preferred Stock, 3,575,000 shares are designated Series C-1 Preferred Stock, 3,752,076 shares are designated Series D-1 Preferred Stock, and 4,500,000 shares are designated Series E-1 Preferred Stock. As of the date hereof, 3,664,286 shares of Common Stock were issued and outstanding, 3,150,000 shares of Series A Preferred Stock, 4,948,946 shares of Series B Preferred Stock, 3,575,000 shares of Series C Preferred Stock, 3,752,076 shares of Series D Preferred Stock, 4,499,964 shares of Series E Preferred Stock, no shares of Series A-1 Preferred Stock, no shares of Series B-1 Preferred Stock, no shares of Series C-1 Preferred Stock, no shares of Series D-1 Preferred Stock, and no shares of E-1 Preferred Stock were issued and outstanding.

C.    The Board of Directors of Nuance-California has determined that, for the purpose of effecting the reincorporation of Nuance-California in the State of Delaware, it is advisable and in the best interests of Nuance-California and its shareholders that Nuance-California merge with and into Nuance-Delaware upon the terms and conditions herein provided.

D.    The respective Boards of Directors and shareholders or stockholders of Nuance-Delaware and Nuance-California have approved this Agreement and have directed that this Agreement be executed by the undersigned officers.

C:\windows\TEMP\1092573.doc

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 02:00 PM 03/20/2000
001139571 - 3128763

30

NOW, THEREFORE, in consideration of the mutual agreements and covenants set forth herein, Nuance-Delaware and Nuance-California hereby agree, subject to the terms and conditions hereinafter set forth, as follows:

## I

## MERGER

1.1    Merger.  In accordance with the provisions of this Agreement, the Delaware General Corporation Law and the California General Corporation Law, Nuance-California shall be merged with and into Nuance-Delaware (the "Merger"), the separate existence of Nuance-California shall cease, Nuance-Delaware shall be, and is herein sometimes referred to as, the "Surviving Corporation," and the name of the Surviving Corporation shall be Nuance Communications, Inc.

1.2    Filing and Effectiveness.  The Merger shall become effective when the following actions shall have been completed:

(a)    This Agreement and the Merger shall have been adopted and approved by the shareholders or stockholders of each Constituent Corporation in accordance with the requirements of the Delaware General Corporation Law and the California General Corporation Law;

(b)    All of the conditions precedent to the consummation of the Merger specified in this Agreement shall have been satisfied or duly waived by the party entitled to satisfaction thereof;

(c)    An executed Agreement of Merger or an executed counterpart of this Agreement meeting the requirements of the Delaware General Corporation Law shall have been filed with the Secretary of State of the State of Delaware; and

(d)    An executed Agreement of Merger or an executed counterpart of this Agreement meeting the requirements of the California General Corporation Law shall have been filed with the Secretary of State of the State of California.

The date and time when the Merger shall become effective, as aforesaid, is herein called the "Effective Date of the Merger."

1.3    Effect of the Merger.  Upon the Effective Date of the Merger, the separate existence of Nuance-California shall cease, and Nuance-Delaware, as the Surviving Corporation, (i) shall continue to possess all of its assets, rights, powers and property as constituted immediately prior to the Effective Date of the Merger, (ii) shall be subject to all actions previously taken by its and Nuance-California's Board of Directors, (iii) shall succeed, without other transfer, to all of the assets, rights, powers and property of Nuance-California in the manner as more fully set forth in Section 259 of the Delaware General Corporation Law, (iv) shall continue to be subject to all of its debts, liabilities and obligations as constituted immediately prior to the Effective Date of the Merger, and (v) shall succeed, without other transfer, to all of the debts, liabilities and obligations of Nuance-California in the same manner as if Nuance-Delaware had itself incurred them, all as more fully provided under the applicable provisions of the Delaware General Corporation Law and the California General Corporation Law.

C:\Wadm\TEMP\692511.doc                         -2-

31

## II

## CHARTER DOCUMENTS, DIRECTORS AND OFFICERS

2.1    Certificate of Incorporation. The Certificate of Incorporation of Nuance-Delaware as in effect immediately prior to the Effective Date of the Merger shall continue in full force and effect as the Certificate of Incorporation of the Surviving Corporation until duly amended in accordance with the provisions thereof and applicable law.

2.2    Bylaws. The Bylaws of Nuance-Delaware as in effect immediately prior to the Effective Date of the Merger shall continue in full force and effect as the Bylaws of the Surviving Corporation until duly amended in accordance with the provisions thereof and applicable law.

2.3    Directors and Officers. The directors and officers of Nuance-California immediately prior to the Effective Date of the Merger shall be the directors and officers of the Surviving Corporation until their successors shall have been duly elected and qualified or until as otherwise provided by law, the Certificate of Incorporation of the Surviving Corporation or the Bylaws of the Surviving Corporation.

## III

## MANNER OF CONVERSION OF STOCK

3.1    Nuance-California Common Stock. Upon the Effective Date of the Merger, each share of Nuance-California Common Stock issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by the Constituent Corporations, the holder of such shares or any other person, be converted into and exchanged for one (1) fully paid and nonassessable shares of Common Stock, $0.001 par value, of the Surviving Corporation.

3.2    Nuance-California Preferred Stock. Upon the Effective Date of the Merger, each share of Nuance-California Preferred Stock issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by the Constituent Corporations, the holder of such shares or any other person, be converted into and exchanged for one (1) fully paid and nonassessable share of the same Series of Preferred Stock, $0.001 per value, of the Surviving Corporation.

3.3    Nuance-California Options and Stock Purchase Rights. Upon the Effective Date of the Merger, the Surviving Corporation shall assume and continue the 1994 Flexible Stock Incentive Plan, 1998 Stock Plan, 2000 Stock Plan, and 2000 Employee Stock Purchase Plan. Each outstanding and unexercised option convertible into Nuance-California Common Stock shall become an option convertible into the Surviving Corporation's Common Stock on the basis of one (1) share of the Surviving Corporation's Common Stock for each share of Nuance-California Common Stock issuable pursuant to any such option on the same terms and conditions and at an exercise price per share equal to the exercise price applicable to any such Nuance-California option at the Effective Date of the Merger.

A number of shares of the Surviving Corporation's Common Stock shall be reserved for issuance upon the exercise of options equal to the number of shares of Nuance-California Common Stock so reserved immediately prior to the Effective Date of the Merger.

3.4    Nuance-Delaware Common Stock. Upon the Effective Date of the Merger, each share of Common Stock, $0.001 par value, of Nuance-Delaware issued and outstanding immediately prior thereto

C:\windows\TEMP\092971.doc                    -3-

shall, by virtue of the Merger and without any action by Nuance-Delaware, the holder of such shares or any other person, be canceled and returned to the status of authorized but unissued shares.

3.5    Exchange of Certificates.    After the Effective Date of the Merger, each holder of an outstanding certificate representing shares of Nuance-California capital stock may, at such shareholder's option, surrender the same for cancellation to the exchange agent designated by the Surviving Corporation (the "Exchange Agent"), and each such holder shall be entitled to receive in exchange therefor a certificate or certificates representing the number of shares of the appropriate class and Series of the Surviving Corporation's capital stock into which the surrendered shares were converted as herein provided. Until so surrendered, each outstanding certificate theretofore representing shares of Nuance-California capital stock shall be deemed for all purposes to represent the number of whole shares of the appropriate class and Series of the Surviving Corporation's capital stock into which such shares of Nuance-California capital stock were converted in the Merger.

The registered owner on the books and records of the Surviving Corporation or the Exchange Agent of any such outstanding certificate shall, until such certificate shall have been surrendered for transfer or conversion or otherwise accounted for to the Surviving Corporation or the Exchange Agent, have and be entitled to exercise any voting and other rights with respect to and to receive dividends and other distributions upon the shares of capital stock of the Surviving Corporation represented by such outstanding certificate as provided above.

Each certificate representing capital stock of the Surviving Corporation so issued in the Merger shall bear the same legends, if any, with respect to the restrictions on transferability as the certificates of Nuance-California so converted and given in exchange therefor, unless otherwise determined by the Board of Directors of the Surviving Corporation in compliance with applicable laws.

If any certificate for shares of Nuance-Delaware stock is to be issued in a name other than that in which the certificate surrendered in exchange therefor is registered, it shall be a condition of issuance thereof that the certificate so surrendered shall be properly endorsed and otherwise in proper form for transfer, that such transfer otherwise be proper and that the person requesting such transfer pay to the Exchange Agent any transfer or other taxes payable by reason of the issuance of such new certificate in a name other than that of the registered holder of the certificate surrendered or establish to the satisfaction of Nuance-Delaware that such tax has been paid or is not payable.

## IV

## GENERAL

4.1    Covenants of Nuance-Delaware.    Nuance-Delaware covenants and agrees that it will, on or before the Effective Date of the Merger:

(a)    Qualify to do business as a foreign corporation in the State of California and in connection therewith irrevocably appoint an agent for service of process as required under the provisions of Section 2105 of the California General Corporation Law;

(b)    File any and all documents with the California Franchise Tax Board necessary for the assumption by Nuance-Delaware of all of the franchise tax liabilities of Nuance-California; and

(c)    Take such other actions as may be required by the California General Corporation Law.

C:\windows\TEMP\092971.doc                                  -4-

33

03/28/2000   10:55    WILSON SONSINI → 913026748340                    NO.837    P06

4.2    Further Assurances. From time to time, as and when required by Nuance-Delaware or by its successors or assigns, there shall be executed and delivered on behalf of Nuance-California such deeds and other instruments, and there shall be taken or caused to be taken by Nuance-Delaware and Nuance-California such further and other actions, as shall be appropriate or necessary in order to vest or perfect in or confirm of record or otherwise by Nuance-Delaware the title to and possession of all the property, interests, assets, rights, privileges, immunities, powers, franchises and authority of Nuance-California and otherwise to carry out the purposes of this Agreement, and the officers and directors of Nuance-Delaware are fully authorized in the name and on behalf of Nuance-California or otherwise to take any and all such action and to execute and deliver any and all such deeds and other instruments.

4.3    Abandonment. At any time before the Effective Date of the Merger, this Agreement may be terminated and the Merger may be abandoned for any reason whatsoever by the Board of Directors of either Nuance-California or Nuance-Delaware, or both, notwithstanding the approval of this Agreement by the shareholders of Nuance-California or by the sole stockholder of Nuance-Delaware, or by both.

4.4    Amendment. The Boards of Directors of the Constituent Corporations may amend this Agreement at any time prior to the filing of this Agreement (or certificate in lieu thereof) with the Secretaries of State of the States of California and Delaware, provided that an amendment made subsequent to the adoption of this Agreement by the shareholders or stockholders of either Constituent Corporation shall not: (1) alter or change the amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares of any class or Series thereof of such Constituent Corporation, (2) alter or change any term of the Restated Certificate of Incorporation of the Surviving Corporation to be effected by the Merger, or (3) alter or change any of the terms and conditions of this Agreement if such alteration or change would materially adversely affect the holders of any class of shares or Series thereof of such Constituent Corporation.

4.5    Registered Office. The registered office of the Surviving Corporation in the State of Delaware is located at Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, Delaware 19801, County of New Castle, and The Corporation Trust Company is the registered agent of the Surviving Corporation at such address.

4.6    Agreement. Executed copies of this Agreement will be on file at the principal place of business of the Surviving Corporation at 1005 Hamilton Court, Menlo Park, California 940251 and copies thereof will be furnished to any shareholder or stockholder of either constituent Corporation, upon request and without cost.

4.7    Governing Law. This Agreement shall in all respects be construed, interpreted and enforced in accordance with and governed by the laws of the State of Delaware and, so far as applicable, the merger provisions of the California General Corporation Law.

4.8    Counterparts. In order to facilitate the filing and recording of this Agreement, the same may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

*   *   *

03/20/2000    12:55    WILSON SONSINI → 513026740340                    NO.837    007

IN WITNESS WHEREOF, this Agreement, having first been approved by resolutions of the Boards of Directors of Nuance-Delaware and Nuance-California, is hereby executed on behalf of each of such two corporations and attested by their respective officers thereunto duly authorized.



Nuance Communications, Inc.
a Delaware corporation

By: _____
    Ronald A. Croen, President

    _____
    Graham V. Smith, Secretary

Nuance Communications
a California corporation

By: _____
    Ronald A. Croen, President

    _____
    Graham V. Smith, Secretary

C:\windows\TEMP\RG92373.doc

35

'03/20/2008    10:55    WILSON SONSINI → 913026748340    NO.637    D08

Nuance Communications
(California Corporation)

## OFFICERS' CERTIFICATE

Ronald A. Croen and Graham V. Smith certify that:

1.    They are the President and the Secretary, respectively, of Nuance Communications, a corporation organized under the laws of the State of California.

2.    The corporation has authorized capital of 89,954,152 shares no par value, consisting of 50,000,000 shares of Common Stock and 39,954,152 shares of Preferred Stock, 3,150,000 shares of which are designated Series A Preferred Stock, 5,000,000 shares of which are designated Series B Preferred Stock, 3,575,000 shares of which are designated Series C Preferred Stock, 3,752,076 shares of which are designated Series D Preferred Stock, 4,500,000 shares of which are designated Series E Preferred Stock, 3,150,000 shares of which are designated Series A-1 Preferred Stock, 5,000,000 shares of which are designated Series B-1 Preferred Stock, 3,575,000 shares of which are designated Series C-1 Preferred Stock, 3,752,076 shares of which are designated Series D-1 Preferred Stock, and 4,500,000 shares of which are designated Series E-1 Preferred Stock.

3.    There were 3,664,286 shares of Common Stock, 3,150,000 shares of Series A Preferred Stock, 4,948,946 shares of Series B Preferred Stock, 3,575,000 shares of Series C Preferred Stock, 3,752,076 shares of Series D Preferred Stock, 4,499,964 shares of Series E Preferred Stock, no shares of Series A-1 Preferred Stock, no shares of B-1 Preferred Stock, no shares of C-1 Preferred Stock, no shares of D-1 Preferred Stock and no shares of E-1 Preferred Stock issued and outstanding as of the date of the shareholders' written consent approving the Agreement and Plan of Merger attached hereto (the "Merger Agreement"). All shares of Common Stock and Preferred Stock outstanding were entitled to vote on the merger.

4.    The principal terms of the Merger Agreement were approved by the Board of Directors and by the vote of a number of shares of each class of stock which equaled or exceeded the vote required.

5.    The percentage vote required was (i) greater than 50% of the votes entitled to be cast by holders of Common Stock, voting together as a separate class, and (ii) greater than 50% of the votes entitled to be cast by the holders of the Preferred Stock, voting separately as a class.

6.    Ron Croen and Graham Smith further declare under penalty of perjury under the laws of the State of California that each has read the foregoing certificate and knows the contents thereof and that the same is true of their own knowledge.

Executed in Menlo Park, California on March 10, 2000.

Ronald A. Croen, President

Graham V. Smith, Secretary

C:\windows\TEMP\093971.doc

36

Nuance Communications, Inc.
(Surviving Corporation)

**OFFICERS' CERTIFICATE**

Ronald A. Croen and Graham V. Smith certify that:

1.      They are the President and the Secretary, respectively, of Nuance Communications, Inc., a corporation organized under the laws of the State of Delaware.

7.      The corporation has authorized capital of 89,954,152 shares, $0.001 par value, consisting of 50,000,000 share of Common Stock and 39,954,152 shares of Preferred Stock, 3,150,000 shares of which are designated Series A Preferred Stock, 5,000,000 shares of which are designated Series B Preferred Stock, 3,575,000 shares of which are designated Series C Preferred Stock, 3,752,076 shares of which are designated Series D Preferred Stock, 4,500,000 shares of which are designated Series E Preferred Stock, 3,150,000 shares of which are designated Series A-1 Preferred Stock, 5,000,000 shares of which are designated Series B-1 Preferred Stock, 3,575,000 shares of which are designated Series C-1 Preferred Stock, 3,752,076 shares of which are designated Series D-1 Preferred Stock, and 4,500,000 shares of which are designated Series E-1 Preferred Stock.

2.      There were 100 shares of Common Stock outstanding and entitled to vote on the Agreement and Plan of Merger attached hereto (the "Merger Agreement"). There were no shares of Preferred Stock outstanding.

3.      The principal terms of the Merger Agreement were approved by the Board of Directors and by the vote of 100% of the outstanding shares of Common Stock of Nuance-Delaware.

4.      The percentage vote required was more than 50% of the votes entitled to be cast by holders of outstanding shares of Common Stock.

5.      Ron Croen and Graham Smith further declare under penalty of perjury under the laws of the State of Delaware that each has read the foregoing certificate and knows the contents thereof and that the same is true of their own knowledge.

Executed in Menlo Park, California on March 10, 2000.

_____
Ronald A. Croen, President

_____
Graham V. Smith, Secretary

C:\windows\TEMP\U092971.doc

37

FROM CORPORATION TRUST WILM. TEAM #2          (THU) 10. 13' 05  19:15/ST. 19:14/NO. 4863796248 P   2

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:14 PM 10/13/2005
FILED 07:01 PM 10/13/2005
SRV 050839821 - 3128763 FILE

## CERTIFICATE OF AMENDMENT TO THE

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF

## NUANCE COMMUNICATIONS, INC.

The undersigned, in his capacity as Chief Executive Officer of Nuance Communications, Inc., does hereby certify that:

1.      He is the duly appointed Chief Executive Officer of Nuance Communications, Inc., a corporation duly organized and existing under the laws of the State of Delaware (the "Company").

2.      The original Certificate of Incorporation of the Company was filed with the Secretary of State of the State of Delaware on November 18, 1999.

3.      Pursuant to and in accordance with Section 242 of the Delaware General Corporation Law (the "DGCL"), this Certificate of Amendment to the Amended and Restated Certificate of Incorporation (the "Certificate of Amendment") amends certain provisions of the Amended and Restated Certificate of Incorporation.

4.      The terms and provisions of this Certificate of Amendment have been duly approved by (a) the unanimous written consent of the Board of Directors of the Company in accordance with the provisions of Section 141 of the DGCL and (b) the written consent of the sole stockholder of the Company pursuant to Section 228 of the DGCL.

5.      Article FIRST of the Certificate of Incorporation is hereby amended to read in its entirety as follows:

"FIRST.    The name of this corporation is Nuance Communications USA, Inc. (the "Corporation")."

(Remainder of Page Intentionally Left Blank)

C:\Documents and Settings\kristin.dwyer\Local Settings\Temporary Internet Files\OLK6\PALIB2_3225796_2.DOC (1561)

38

FROM CORPORATION TRUST WILM. TEAM #2        (THU) 10. 13' 05 19:15/ST. 19:14/NO. 4863796248 P  3

IN WITNESS WHEREOF, this Certificate of Amendment to the Amended and Restated Certificate of Incorporation of the Company, which amends Article FIRST of the Amended and Restated Certificate of Incorporation of the Company, having been duly adopted in accordance with Section 242 of the DGCL, has been duly executed by the undersigned as of October 13, 2005.

/s/: Paul A. Ricci
Paul A. Ricci
*Chief Executive Officer*

# EXHIBIT D

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# SCHEDULE 14A

**(RULE 14a-101)**
**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a)**
**of the Securities Exchange Act of 1934**

Filed by the Registrant ☑

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☑    Definitive Proxy Statement

☐    Confidential, for use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to § 240.14a-12

# NUANCE COMMUNICATIONS, INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on table below per Exchange Act rules 14a-6(i)(1) and 0-11.

    (1) Title of each class of securities to which transaction applies:

    (2) Aggregate number of securities to which transaction applies:

    (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4) Proposed maximum aggregate value of transaction: ~

    (5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

**EXHIBIT D**        **40**

defm14a

Table of Contents



August 1, 2005

Dear Stockholders of Nuance Communications, Inc.:

We will hold a special meeting of our stockholders at our offices located at 1350 Willow Road, Menlo Park, California 94025, on August 31, 2005 at 8:00 a.m. Pacific time.

At the special meeting, you will be asked to consider and vote upon the following proposal:

To adopt the merger agreement and approve the merger contemplated thereby. Upon completion of the merger, holders of Nuance common stock will be entitled to receive (i) 0.77 shares of ScanSoft common stock, and (ii) $2.20 of cash, for each share of Nuance common stock they hold at that time. Nuance common stock is listed on the NASDAQ National Market under the trading symbol "NUAN." ScanSoft common stock is listed on the NASDAQ National Market under the trading symbol "SSFT."

The foregoing proposal is described in detail in the attached notice of special meeting of stockholders and joint proxy statement/ prospectus.

AFTER CAREFUL CONSIDERATION, YOUR BOARD OF DIRECTORS HAS UNANIMOUSLY APPROVED THE PROPOSAL REFERRED TO ABOVE RELATING TO THE ADOPTION OF THE MERGER AGREEMENT AND THE APPROVAL OF THE MERGER WITH SCANSOFT, AND DETERMINED THAT SUCH PROPOSAL IS FAIR TO AND IN THE BEST INTERESTS OF NUANCE AND ITS STOCKHOLDERS. YOUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO ADOPT THE MERGER AGREEMENT AND APPROVE THE MERGER.

In the material accompanying this letter, you will find a notice of special meeting of stockholders, a joint proxy statement/ prospectus relating to the actions to be taken by Nuance stockholders at the Nuance special meeting (as well as the actions to be taken by the ScanSoft stockholders at their special meeting) and a proxy. The joint proxy statement/ prospectus more fully describes the merger agreement and the proposed merger, and includes information about Nuance and ScanSoft.

**We encourage you to read the joint proxy statement/ prospectus, which includes important information about the merger. IN ADDITION, THE SECTION ENTITLED "RISK FACTORS", BEGINNING ON PAGE 18 OF THE JOINT PROXY STATEMENT/ PROSPECTUS, CONTAINS A DESCRIPTION OF RISKS THAT YOU SHOULD CONSIDER IN EVALUATING THE MERGER.**

It is important that you use this opportunity to take part in the affairs of Nuance by voting on the business to come before this meeting. WHETHER OR NOT YOU EXPECT TO ATTEND THE MEETING, PLEASE COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE ACCOMPANYING PROXY IN THE ENCLOSED POSTAGE-PAID ENVELOPE SO THAT YOUR SHARES MAY BE REPRESENTED AT THE MEETING. YOUR VOTE IS VERY IMPORTANT. Returning the proxy does not deprive you of your right to attend the meeting and to vote your shares in person.

Sincerely,

/s/ CHARLES W. BERGER

Charles W. Berger
Chief Executive Officer

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THIS TRANSACTION OR THE SECURITIES OF SCANSOFT TO BE ISSUED PURSUANT TO THE MERGER, OR DETERMINED IF THIS JOINT PROXY STATEMENT/ PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

This joint proxy statement/ prospectus is dated August 1, 2005, and is first being mailed to Nuance stockholders on or about August 3, 2005.

Table of Contents



# NUANCE COMMUNICATIONS, INC.

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS TO BE HELD

Dear Stockholders of Nuance Communications, Inc.:

NOTICE IS HEREBY GIVEN that a special meeting of stockholders of Nuance Communications, Inc., a Delaware corporation, will be held on August 31, 2005 at 8:00 a.m. Pacific time, at Nuance's offices located at 1350 Willow Road, Menlo Park, California 94025, for the following purpose:

(1) To adopt the Agreement and Plan of Merger, dated as of May 9, 2005, among ScanSoft, Inc., a Delaware corporation, Nova Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of ScanSoft, Nova Acquisition LLC, a Delaware limited liability company and a wholly-owned subsidiary of ScanSoft, and Nuance (the "merger agreement") and approve the merger contemplated thereby. Upon completion of the merger, holders of Nuance common stock will be entitled to receive (i) 0.77 shares of ScanSoft common stock, and (ii) $2.20 of cash, for each share of Nuance common stock they hold at that time; and

(2) To transact such other business as may properly come before the special meeting or any postponement or adjournment thereof.

The terms of the proposed merger with ScanSoft and the related merger agreement are more fully described in the joint proxy statement/ prospectus attached to this notice.

The Nuance board of directors has determined that the proposal described above relating to the adoption of the merger agreement and the approval of the merger is advisable and in the best interests of Nuance and its stockholders and that such proposal is fair to Nuance and to its stockholders, and unanimously recommends that Nuance stockholders vote "FOR" the proposal to adopt the merger agreement and approve the merger.

The Nuance board of directors has fixed the close of business on July 27, 2005 as the record date for determination of Nuance stockholders entitled to notice of, and to vote at, the Nuance special meeting and at any postponements or adjournments thereof. A list of stockholders entitled to vote will be available at 1350 Willow Road, Menlo Park, California 94025 for 10 days prior to the Nuance special meeting during ordinary business hours.

WE ENCOURAGE YOU TO VOTE ON THESE IMPORTANT MATTERS.

By Order of the Board of Directors of Nuance

/s/ DOUGLAS CLARK NEILSSON

Douglas Clark Neilsson
Vice President, Secretary and General Counsel

Menlo Park, California
August 1, 2005

YOU ARE CORDIALLY INVITED TO ATTEND THE NUANCE SPECIAL MEETING IN PERSON. WHETHER OR NOT YOU PLAN TO ATTEND THE NUANCE SPECIAL MEETING, PLEASE SIGN, DATE AND RETURN THE ACCOMPANYING PROXY CARD IN THE ENCLOSED ENVELOPE.

42

Table of Contents

## QUESTIONS AND ANSWERS ABOUT THE MERGER OF SCANSOFT AND NUANCE

### GENERAL QUESTIONS AND ANSWERS

**Q: WHY ARE SCANSOFT AND NUANCE PROPOSING THE MERGER?**

A: We are proposing the merger because we believe the combination of our two companies will result in a comprehensive portfolio of speech applications, industry-defining technologies and technical expertise in network speech, embedded speech and dictation, which will allow the combined company to support partners and customers on a global scale more effectively and efficiently. Furthermore, after reviewing numerous strategic alternatives for enhancing stockholder value, the boards of directors of both ScanSoft, Inc. and Nuance Communications, Inc. believe that the merger will:

    1. better position the combined company to accelerate the development and adoption of innovative speech-enabled applications and services worldwide;

    2. increase the rate of innovation through the exchange of ideas and technologies among varied development teams;

    3. better equip the combined company to compete with a number of new, very large and well resourced competitors; and

    4. generate cost synergies through headcount reductions, office site consolidations and reductions in marketing and administrative expenses.

**Q: WHAT WILL HAPPEN PURSUANT TO THE MERGER?**

A: We are proposing a two step merger pursuant to which in the first step, Nova Acquisition Corporation, a wholly owned subsidiary of ScanSoft, will merge with and into Nuance, and thereafter will cease to exist as a separate corporate entity. After the first step merger, Nuance will be a wholly owned subsidiary of ScanSoft. In the second step, Nuance will merge with and into Nova Acquisition LLC, a wholly owned subsidiary of ScanSoft, and thereafter Nuance will cease to exist as a separate corporate entity. After the second step, Nova Acquisition LLC will be a wholly owned subsidiary of ScanSoft. We refer to the first step merger, together with the second step merger, herein as the "merger." Pursuant to the merger agreement, no later than 90 days following the effective time of the merger, ScanSoft will change its corporate name to "Nuance."

Assuming the merger and the financing with Warburg Pincus and its affiliates pursuant to the Stock Purchase Agreement had been completed on May 9, 2005, Nuance stockholders would have owned approximately 18% of the outstanding shares of ScanSoft common stock immediately after the merger and financing and ScanSoft stockholders would have owned the remaining 82% (not including options, warrants and other convertible securities outstanding).

**Q: WHAT STOCKHOLDER APPROVALS ARE REQUIRED TO COMPLETE THE MERGER?**

A: We cannot complete the merger unless, among other things, a majority of the outstanding shares of Nuance common stock entitled to vote at the Nuance special meeting vote to adopt the merger agreement and approve the merger. As of July 27, 2005, Nuance directors and executive officers and one of its significant stockholders, SRI International, were entitled to vote approximately 8% of the outstanding shares of Nuance common stock (not including options, warrants and other convertible securities outstanding). These directors and executive officers and the significant stockholder have already agreed with ScanSoft, in a voting agreement, to vote their shares of Nuance common stock in favor of the adoption of the merger agreement and the approval of the merger. The voting agreements permit the sale of a limited number of shares of common stock by each of these directors and executive officers and the significant stockholder.

In addition, a majority of the votes cast at the ScanSoft special meeting on (i) the proposal to approve the issuance of shares of ScanSoft common stock to Nuance stockholders in the merger and (ii) the proposal to approve the Stock Purchase Agreement by and among ScanSoft and Warburg

vi

43

Table of Contents

Pincus Private Equity VIII, L.P. and certain of its affiliated entities (collectively, "Warburg Pincus") and the issuance of the shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement must be voted in favor of such proposals in order to complete the merger. Although not required to complete the merger, ScanSoft is also soliciting the approval of its stockholders to assume certain Nuance stock options in the manner set forth in the merger agreement. As of July 27, 2005, ScanSoft directors, executive officers and certain affiliates were entitled to vote approximately 16% of the outstanding shares of ScanSoft common stock (not including options, warrants and other convertible securities outstanding). These directors, executive officers and affiliates have already agreed with Nuance to vote their shares of ScanSoft common stock in favor of the transactions contemplated by the merger agreement, including the issuance of shares of ScanSoft common stock to Nuance stockholders in the merger, the issuance of shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement and the assumption of certain Nuance stock options in the manner set forth in the merger agreement. The voting agreements permit the sale of a limited number of shares of common stock by ScanSoft directors, executive officers and affiliates.

**Q: HOW DO THE BOARDS OF DIRECTORS OF SCANSOFT AND NUANCE RECOMMEND THAT I VOTE?**

A: The ScanSoft board of directors unanimously recommends that ScanSoft stockholders vote "FOR" the proposal to approve the issuance of shares of ScanSoft common stock in connection with the merger, "FOR" the proposal to approve the Stock Purchase Agreement and the issuance of shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement, and "FOR" the proposal to approve the assumption by ScanSoft of stock options outstanding under Nuance's stock option plans with an exercise price of $10.00 or less in the manner set forth in the merger agreement (the "Option Assumption").

The Nuance board of directors unanimously recommends that Nuance stockholders vote "FOR" the proposal to adopt the merger agreement and approve the merger.

**Q: WHEN DO YOU EXPECT TO COMPLETE THE MERGER?**

A: We expect to complete the merger as quickly as possible once all the conditions to the merger, including obtaining the approvals of ScanSoft and Nuance stockholders, are fulfilled. While we cannot predict the exact timing, we currently expect to complete the merger in September of 2005.

**Q: WHY ARE SCANSOFT STOCKHOLDERS BEING ASKED TO APPROVE THE STOCK PURCHASE AGREEMENT AND THE ISSUANCE OF THE SHARES OF SCANSOFT COMMON STOCK AND WARRANTS TO ACQUIRE SCANSOFT COMMON STOCK PURSUANT TO THE STOCK PURCHASE AGREEMENT?**

A: Rule 4350(i) of the Nasdaq Marketplace Rules requires that listed companies obtain stockholder approval in certain circumstances, which include: (i) when an issuance or potential issuance of securities would result in a change of control of the issuer as defined under the Nasdaq Marketplace Rules, (ii) when an equity compensation arrangement is made, pursuant to which stock may be acquired by directors or directors' affiliates, and (iii) when in connection with the acquisition of the stock or assets of another company, where due to the issuance of common stock or securities convertible into common stock, the securities to be issued represent or will represent 20% or more of the voting power or number of shares of common stock outstanding before the issuance.

ScanSoft stockholders are being asked to approve the Stock Purchase Agreement and the issuance of the shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement because the acquisition of such securities by Warburg Pincus implicates each of these circumstances.

vii

Table of Contents

**Q: HOW MANY SHARES OF SCANSOFT COMMON STOCK WILL WARBURG PINCUS BENEFICIALLY OWN FOLLOWING THE MERGER AND THE ISSUANCE OF THE SECURITIES PURSUANT TO THE STOCK PURCHASE AGREEMENT?**

A: Warburg Pincus will beneficially own approximately 25% of ScanSoft's common stock following the merger and the issuance of the shares and warrants pursuant to the Stock Purchase Agreement, assuming that they do not dispose of the shares of ScanSoft common stock held by them prior to such time.

**Q: WHAT WILL HAPPEN IF SCANSOFT STOCKHOLDERS DO NOT APPROVE THE ISSUANCE OF THE SHARES OF SCANSOFT COMMON STOCK AND WARRANTS TO ACQUIRE SCANSOFT COMMON STOCK PURSUANT TO THE STOCK PURCHASE AGREEMENT?**

A: The completion of the merger is conditioned on the approval of the Stock Purchase Agreement and the issuance of the shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement by ScanSoft's stockholders. If the Stock Purchase Agreement and the issuance of the shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement are not approved by ScanSoft's stockholders, the merger will not be consummated. Accordingly, a vote against the Stock Purchase Agreement and the issuance of the shares of ScanSoft common stock and warrants to acquire ScanSoft common stock pursuant to the Stock Purchase Agreement is effectively a vote against the merger.

**Q: WHERE CAN I FIND MORE INFORMATION ABOUT SCANSOFT AND NUANCE?**

A: You can find more information about ScanSoft and Nuance from reading this joint proxy statement/ prospectus and the various sources described in this joint proxy statement/ prospectus under the section entitled "Where You Can Find More Information" on page 147.

viii

Table of Contents

upon forecasts of future results are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by such analyses. The foregoing summary does not purport to be a complete description of the analyses performed by Thomas Weisel Partners. As described above, Thomas Weisel Partners' opinion to the ScanSoft board of directors was among the many factors taken into consideration by the ScanSoft board of directors in making its determination to approve the merger agreement. The parties to the merger agreement determined the exchange ratio based on the result of arms' length negotiations, and Thomas Weisel Partners was not asked to, and did not, propose any alternative exchange ratio to the ScanSoft board of directors.

Thomas Weisel Partners is a nationally recognized investment banking firm that is regularly engaged in the valuation of businesses and their securities in connection with mergers and acquisitions. ScanSoft retained Thomas Weisel Partners based on these qualifications as well as its familiarity with ScanSoft. Thomas Weisel Partners has previously acted as an underwriter in connection with offerings of securities of each of ScanSoft and Nuance, for which Thomas Weisel Partners received customary underwriting compensation.

Pursuant to the terms of an engagement letter, Thomas Weisel Partners, provided financial advisory services and an opinion with respect to the fairness to ScanSoft of the merger consideration payable in connection with the transaction, and ScanSoft agreed to pay Thomas Weisel Partners a fee in connection therewith, a significant portion of which is contingent upon the consummation of the transaction. The ScanSoft board of directors was aware of this fee structure and took it into account in considering Thomas Weisel Partners' opinion and in approving the transaction. Whether or not the merger is completed, ScanSoft has agreed to reimburse Thomas Weisel Partners for all its reasonable out-of-pocket expenses, including the reasonable fees and disbursements of its counsel and other advisors, incurred in connection with its engagement by ScanSoft, and to indemnify Thomas Weisel Partners against liabilities, including liabilities under federal securities law, and expenses in connection with its engagement.

## Consideration of the Merger by Nuance

### Nuance's Reasons for the Merger and Recommendation of the Nuance Board of Directors

The Nuance board of directors has determined that the terms of the merger agreement and the merger are advisable, fair to, and in the best interests of, Nuance and its stockholders. In the course of reaching its decision to approve the merger and to approve and adopt the merger agreement, the Nuance board of directors consulted with our management, Credit Suisse First Boston and legal counsel.

The decision of the Nuance board of directors was based upon a number of potential benefits of the transaction, including the following:

* the ability to better serve the customer base and partners of each company with a comprehensive portfolio of technologies, applications and expertise that will enable customers to effectively deploy innovative speech solutions;

* the belief that a merger with ScanSoft could enhance the combined company's ability to compete with larger, better-resourced competitors by bringing together the speech-focused talents, resources and intellectual property of the two companies;

* the opportunity for each company to introduce its complementary product lines into the customer base of the other company;

* the greater global presence of the combined company;

* the expected synergies and cost-saving opportunities that should result from headcount reductions, office site consolidations and eliminating redundant operating expenses; and

* the belief that the merger would combine two experienced and respected management teams, resulting in a combined management team that is stronger than the management teams of each of the individual companies.

63

Table of Contents

In addition to the potential benefits accruing to Nuance and its stockholders from the merger, the Nuance board of directors also considered a number of other factors in approving the merger, including the following:

- the merger consideration relative to the current and historical market prices of Nuance common stock, and in particular the fact that, based on the closing price of ScanSoft common stock on May 6, 2005, the (i) 0.77 of a share of ScanSoft common stock, and (ii) $2.20 of cash, for each share of Nuance common stock represented a 84.73% premium over the closing price of Nuance common stock on May 6, 2005, the last trading day before the announcement of the proposed transaction, a 99.7% premium over the average of the closing prices of Nuance common stock during the month leading up to the announcement and a 63.31% premium over the average for the closing prices during the six months leading up to the announcement;

- the fact that part of the merger consideration will be paid in cash provides some certainty as to the value to be received by Nuance stockholders, while the stock portion of the merger consideration will allow Nuance stockholders to participate in the growth and opportunities of the combined company;

- the financial analyses reviewed with the Nuance board of directors on May 6, 2005 by Credit Suisse First Boston LLC and the oral opinion of Credit Suisse First Boston rendered to the Nuance board of directors on May 9, 2005, subsequently confirmed in writing, to the effect that, as of the date of the Credit Suisse First Boston opinion, and based upon and subject to the factors and assumptions set forth in its opinion, the merger consideration of (i) 0.77 of a share of ScanSoft common stock, and (ii) $2.20 of cash, for each share of Nuance common stock to be received by the holders of Nuance common stock pursuant to the merger was fair, from a financial point of view, to the holders of Nuance common stock, other than affiliates of Nuance (a copy of such written opinion is attached as Annex C to this proxy statement/ prospectus);

- the judgment of the Nuance board of directors, based on arm's-length negotiations with ScanSoft, that the merger consideration of (i) 0.77 of a share of ScanSoft common stock, and (ii) $2.20 of cash, for each share of Nuance common stock represented the highest price that could be negotiated with ScanSoft;

- the progress of negotiations with a third party that had expressed an interest in acquiring Nuance, including without limitation that (i) the Nuance board of directors determined that the price proposal from the other company was not superior to that offered by ScanSoft, and (ii) the judgment of the Nuance board of directors that further negotiations with the other party would not yield a substantial improvement in terms;

- the prospects for our business and the potential stockholder value that could be expected to be generated if we were to remain an independent, publicly traded company, including our business strategy going forward, our cash reserves, the uncertainty of being able to expand our product lines and sales channels and continued consolidation in our industry and increased competition, especially from competitors with greater name recognition and financial and other resources, and the difficulty of achieving substantial revenue growth;

- the terms and conditions of the merger agreement including:

  - the fact that the merger agreement enables the Nuance board of directors, in the exercise of its fiduciary duties, to authorize Nuance to participate in discussions and negotiations with and furnish non-public information to a third party in connection with an unsolicited bid to acquire Nuance, change its recommendation in favor of the merger with ScanSoft, and potentially enter into a transaction with another acquirer, subject to certain limitations as set forth in the merger agreement, and in certain circumstances, subject to the payment of a termination fee of $6.63 million, which constitutes approximately 3% of the merger consideration;

64

defm14a                                                                Page 86 of 315

Table of Contents

- Nuance is not obligated to pay the $6.63 million termination fee upon a termination of the merger agreement due to the Nuance stockholders failing to approve the merger unless prior to such termination there has been public disclosure of an acquisition proposal and within 12 months following the termination of the merger agreement, Nuance consummates an acquisition or enters into an agreement providing for an acquisition of Nuance; and

- the limited number and nature of the conditions to ScanSoft's obligation to close the merger and the limited risk of non-satisfaction of such conditions;

- the intent that the stock portion of the merger consideration be tax-free to Nuance's U.S. stockholders;

- the competitive and market environments in which Nuance and ScanSoft operate;

- the results of the due diligence investigation of ScanSoft conducted by Nuance's management, financial advisor, accountants and legal counsel;

- the Nuance board of directors' own knowledge of Nuance, ScanSoft and their respective businesses; and

- the likelihood the merger will be completed on a timely basis, including the likelihood that the merger will be approved by the appropriate regulatory authorities.

In reaching its decision to approve the merger agreement and the merger, the Nuance board of directors also identified and considered a number of potentially negative factors that could result from the merger, including the following:

- the risks that the integration of the businesses, products and personnel of the two companies will not be successfully implemented and may require a significant amount of management time and resources;

- the risk that the potential synergies and cost-saving opportunities identified by ScanSoft and Nuance will not be fully realized or not fully realized in the time frame anticipated;

- in the event that the transaction is not consummated, the possible negative effects of the announcement of the merger on our relationships with customers and suppliers, employee morale and potential loss of key employees, and the impact on our sales, operating results and stock price, and the negative impact that the transaction costs incurred in connection with the proposed merger would have on our cash reserves and operating results;

- the possibility that the reactions of existing and potential competitors to the combination of the two businesses could adversely impact the competitive environment in which the companies operate;

- because Nuance stockholder will receive shares of ScanSoft common stock as part of the merger consideration, the price volatility of ScanSoft's common stock which may reduce the market price of the ScanSoft common stock that Nuance stockholders will receive upon the closing of the merger;

- the restrictions that the merger agreement imposes on actively soliciting competing bids, and the fact we would be obligated to pay a termination fee of $6.63 million in certain circumstances;

- the limitations that the merger agreement imposes on our ability to operate our business until the transaction closes or is terminated;

- the risk of diverting management's attention from other strategic priorities to implement merger integration efforts; and

- the other risks described in this joint proxy statement/prospectus in the section entitled "Risk Factors."

65

defm14a                                                              Page 255 of 315

Table of Contents

IN WITNESS WHEREOF, the parties hereto have caused this Agreement and Plan of Merger to be executed by their duly authorized respective officers as of the date first written above.

SCANSOFT, INC.

By: /s/ Paul Ricci
Name: Paul Ricci
Title:    Chairman & CEO

NUANCE COMMUNICATIONS, INC.

By: /s/ Charles W. Berger
Name: Charles W. Berger
Title:    President & CEO

NOVA ACQUISITION CORPORATION

By: /s/ Paul Ricci
Name: Paul Ricci
Title:    Chairman & CEO

NOVA ACQUISITION LLC

By: /s/ Paul Ricci
Name: Paul Ricci
Title:    CEO

*[Signature Page to Agreement and Plan of Merger]*

A-68

# EXHIBIT E



PAGE  1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "NUANCE COMMUNICATIONS, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-FIRST DAY OF SEPTEMBER, A.D. 1995, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "VISIONEER COMMUNICATIONS, INC." TO "VISIONEER, INC.", FILED THE TWELFTH DAY OF OCTOBER, A.D. 1995, AT 9 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE NINETEENTH DAY OF OCTOBER, A.D. 1995, AT 9 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE FIFTH DAY OF DECEMBER, A.D. 1995, AT 9 O'CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE FIFTH DAY OF DECEMBER, A.D. 1995, AT 9:05 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE THIRTEENTH DAY OF DECEMBER, A.D. 1995, AT 9 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE SECOND DAY OF MARCH, A.D. 1999, AT 8 O'CLOCK A.M.

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 4599034

DATE: 03-17-06

2545096  8100H

060258220

**EXHIBIT E**

50

# Delaware

PAGE 2

### The First State

CERTIFICATE OF MERGER, CHANGING ITS NAME FROM "VISIONEER, INC." TO "SCANSOFT, INC.", FILED THE SECOND DAY OF MARCH, A.D. 1999, AT 8:01 O'CLOCK A.M.

CERTIFICATE OF CORRECTION, FILED THE SEVENTH DAY OF FEBRUARY, A.D. 2000, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE THIRTEENTH DAY OF MARCH, A.D. 2000, AT 9 O'CLOCK A.M.

RESTATED CERTIFICATE, FILED THE EIGHTH DAY OF MAY, A.D. 2000, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE SIXTH DAY OF AUGUST, A.D. 2004, AT 3:07 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "SCANSOFT, INC." TO "NUANCE COMMUNICATIONS, INC.", FILED THE SEVENTEENTH DAY OF OCTOBER, A.D. 2005, AT 9:49 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "NUANCE COMMUNICATIONS, INC.".

*Harriet Smith Windsor*

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 4599034

DATE: 03-17-06

2545096   8100H

060258220

51

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:49 AM 10/17/2005
FILED 09:49 AM 10/17/2005
SRV 050841348 - 2545096 FILE

# CERTIFICATE OF OWNERSHIP AND MERGER

## MERGING

## NUANCE COMMUNICATIONS, INC.

## INTO

## SCANSOFT, INC.

Pursuant to Section 253 of the General Corporation Law of the State of Delaware, ScanSoft, Inc. (the "Company"), a corporation organized and existing under the laws of Delaware,

**DOES HEREBY CERTIFY:**

**FIRST:** That the Company was incorporated as Visioneer Communications, Inc. on September 21, 1995 pursuant to the General Corporation Law of the State of Delaware.

**SECOND:** That the Company changed its name to Visioneer, Inc. effective as of October 12, 1995.

**THIRD:** That the Company changed its name to ScanSoft, Inc. effective as of March 2, 1999.

**FOURTH:** That the Company owns all of the outstanding capital stock of Nuance Communications, Inc., a corporation incorporated on October 14, 2005 pursuant to the General Corporation Law of the State of Delaware.

**FIFTH:** That the Company, by the following resolutions of its Board of Directors, duly adopted by unanimous written consent on October 14, 2005, determined to merge Nuance Communications, Inc. with and into the Company:

WHEREAS: the Company owns all of the outstanding capital stock of Nuance Communications, Inc., a Delaware corporation ("Nuance").

WHEREAS: the Company desires to merge Nuance with and into the Company pursuant to Section 253 of the Delaware General Corporation Law to change the Company's name to "Nuance Communications, Inc."

NOW, THEREFORE, BE IT RESOLVED: that the Board of Directors hereby authorizes the Company to merge with Nuance, with the Company being the surviving corporation, and to assume all of Nuance's liabilities and obligations (the "Merger").

RESOLVED FURTHER: that the Merger shall be effective on October 17, 2005 in connection with the filing of a Certificate of Ownership and Merger with the Secretary of the State of Delaware.

C:\Documents and Settings\kristin.dwyer\Local Settings\Temporary Internet Files\OLK6\DPALRI2_3213339 2.DOC (2403)

52

**RESOLVED FURTHER:** that upon the effectiveness of the Merger, the name of the Company shall be changed to "Nuance Communications, Inc." and Article I of the Amended and Restated Certificate of Incorporation of the Company shall be amended to read in its entirety as follows:

### "ARTICLE I

The name of this corporation is Nuance Communications, Inc."

**RESOLVED FURTHER:** that the Board of Directors hereby authorizes and directs the appropriate officers of the Company (the "Authorized Persons"), and each of them, to execute and file all documents, including a Certificate of Ownership and Merger, and to take all other actions which they deem necessary or desirable to carry out the intent or accomplish the purposes of the foregoing resolutions.

IN WITNESS WHEREOF, ScanSoft, Inc. has caused this certificate to be signed by Paul Ricci, its Chairman of the Board and Chief Executive Officer, this 17th day of October 2005.

SCANSOFT, INC.

By: /s/ Paul A. Ricci

Name: Paul A. Ricci

Title: Chairman of the Board and Chief Executive Officer

54

# EXHIBIT F

Redacted

EXHIBIT G

Redacted

# EXHIBIT H

Redacted

# EXHIBIT I

Redacted

EXHIBIT J

Redacted

# EXHIBIT K

REDACTED

REDACTED

REDACTED

REDACTED

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Letter to Jennifer R. Johnson
March 24, 2006
Page 5


cc:  Dale M. Cendali, Esq. (by facsimile)
     Mark A. Samuels, Esq. (by personal service)
     Lisa C. Berry, Esq. (by e-mail)

1469517

70

3/24/2006 14:13 FAX 310 203 7199          IRELL & MANELLA          ☒001

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                 3637
CONNECTION TEL                      2#152#12123262061
CONNECTION ID
ST. TIME                 03/24 14:11
USAGE T                  01'44
PGS. SENT                6
RESULT                   OK
```

## IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Facsimile No.: (310) 203-7199
Telephone No.: (310) 277-1010
Facsimile Dept. Ext.: 8200

This communication may contain confidential or privileged information and may constitute inside information. It is intended only for the addressee. Any distribution, reading, copying, or use of this communication by anyone other than the addressee is strictly prohibited and may be unlawful. If you received this in error, please notify us immediately by telephone, and return the original communication to us at the above address by mail. You will be reimbursed for your reasonable expenses. Thank you.

Date:   March 24, 2006                            VIA FACSIMILE

Facsimile No.:   (212) 326-2061                   Sent by:

ice Telephone No.:   (212) 326-2051               Reference No.:

To:   Dale M. Cendali, Esq.

From:   Ilan D. Jablon                            Received by:

cc:                                               Time:

No. of Pages:   6
cluding cover page)

71

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Facsimile No.: (310) 203-7199
Telephone No.: (310) 277-1010
Facsimile Dept. Ext.: 8200

This communication may contain confidential or privileged information and may constitute inside information. It is intended only for the addressee. Any distribution, reading, copying, or use of this communication by anyone other than the addressee is strictly prohibited and may be unlawful. If you received this in error, please notify us immediately by telephone, and return the original communication to us at the above address by mail. You will be reimbursed for your reasonable expenses. Thank you.

Date: March 24, 2006

**VIA FACSIMILE**

Facsimile No.: (212) 326-2061

Sent by: _Fh_

Office Telephone No.: (212) 326-2051

Reference No.: _24/5_

To: Dale M. Cendali, Esq.

From: Ian D. Jablon

Received by: _____

cc:

Time: _____

No. of Pages: 6
(including cover page)

Original will be sent via: ☐ Mail ☐ E-mail ☐ Pouch ☐ Messenger ☐ Overnight Courier ☐ Will not be sent

1469793

72

**Stanfield, Beverly**

From:          Worldwide
               Friday, March 24, 2006 3:49 PM
To:            Stanfield, Beverly
Subject:       FW: POD for Control Number 608202


-----Original Message-----
From: rubenf@wwatty.com [mailto:rubenf@wwatty.com]
Sent: Friday, March 24, 2006 3:46 PM
To: Worldwide
Subject: POD for Control Number 608202


                WORLDWIDE NETWORK INC.

ATTN: BEVERLY X 8202

CTRL:   608202    ORDER DATE: 3/24/06    SERVICE TYPE: HOTDLVR
CUST:   157 IRELL & MANELLA, LLP                REF: 159802-0001-IJBL

PU: IRELL & MANELLA, LLP        DL: O'MELVENY & MYERS
    1800 AVENUE OF THE STARS        400 SOUTH HOPE STREET
    CENTURY CITY     CA 90067       LOS ANGELES     CA 90071
    RM:B LEVEL       USA            RM:10TH FLOOR   USA
    TO SEE: SCOTT CRAWFORD          TO SEE: MARK A.SAMUELS

    DATE:  3/24/06    TIME: 15:46    SIGN: ROLANDO C

1

73